860 A.2d 67

George BOCHETTO, Esquire and Bochetto
and Lentz, P.C, Appellants,

v.

Kevin W. GIBSON, Esquire and Kassab,
Archbold & O'Brien, Appellees.

Supreme Court of Pennsylvania.

Argued April 13, 2004.

Decided Oct. 20, 2004.

Stephen E. Skovron, Esq., G. Alexander Bochetto, Esq., Philadelphia, for George Bochetto, Esquire and Bochetto & Lentz, P.C.

Thomas D. Paradise, Esq., Robert Steven Tintner, Esq., Abraham C. Reich, Esq., Philadelphia, for Kevin William Gibson and Kasab Archbold & O'Brien, L.L.C.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, SAYLOR, EAKIN and BAER, JJ.

### OPINION OF THE COURT

Justice NIGRO.

At issue in this appeal is whether an attorney is absolutely immune from liability on the basis of the judicial privilege when he faxes to a reporter a complaint that he has previously filed. For the reasons that follow, we hold that the judicial privilege does not protect an attorney from liability for such conduct.

In April 1997, Pickering Hunt ("Pickering"), a Pennsylvania non-profit corporation,[1] hired Appellant George Bochetto, Esquire, an employee, officer, and shareholder of the law firm of Bochetto & Lentz, P.C., to defend it in two lawsuits concern-

---

1. Pickering is primarily an organization for persons who engage in fox hunting in Chester County, Pennsylvania.

ing real estate in Chester County.[2] These two lawsuits were consolidated for a nonjury trial, following which the trial court found in favor of the plaintiffs and against Pickering.[3] Pickering subsequently hired Appellee Kevin W. Gibson, Esquire, who was an employee of the law firm of Kassab, Archbold & O'Brien, to bring a legal malpractice claim on its behalf against Bochetto and his firm, Bochetto & Lentz.

On October 1, 1999, Gibson filed a malpractice complaint against Bochetto and Bochetto & Lentz on Pickering's behalf. The complaint alleged that Bochetto had breached his fiduciary duty to Pickering in connection with the Chester County real estate action when he failed to inform Pickering about an initial expert report he had received in which the expert opined that: (1) a court might find that Pickering did not have an easement over the land that was the subject of the litigation; (2) Pickering had only a 5 to 10 percent chance of prevailing in the litigation; and (3) the value of Pickering's interest in the land at issue was somewhere between $64,500 and $129,000.[4] Moreover, the complaint alleged that Bochetto

2. The first suit, *John L. Sbarbaro, Jr., et al. v. Henry C. Biddle, Jr., et al.,* Chester C.P. No. 97-01365, was a quiet title action in which the plaintiffs sought a declaration from the court that the Sbarbaro family trust was entitled to exclusive use and quiet enjoyment of property in Chester County that was held in the trust's name. Pickering opposed the action, asserting that it had an easement over the property under the terms of the property's 1948 deed. In the second suit, *John L. Sbarbaro, Jr., et al. v. Henry C. Biddle, Jr., et al.,* Chester C.P. No. 97-02936, the plaintiffs sought specific performance of an alleged contract entered into between the trust and an officer of Pickering, in which the officer agreed to sell Pickering's rights to the property for $5,000. Pickering argued that it was not bound by the alleged contract because the officer who agreed to the sale did not have authority to make such an agreement.

3. The trial court declared that the Sbarbaro family trust was entitled to exclusive use and quiet enjoyment of the property and that Pickering did not have any interest in the property. The trial court further found that Pickering was bound by the contract entered into between the trust and one of Pickering's officers and that pursuant to that contract, Pickering was required to execute a declaration renouncing any interest it may have had in the property. Finally, the trial court awarded the plaintiffs damages in the amount of $288,874.

4. The complaint asserted that Bochetto & Lentz was liable for the acts of Bochetto under the doctrine of respondeat superior and Pennsylvania law governing partnerships.

had instructed the expert to draft a second report without any reference to the possibility of a court finding that Pickering did not have an easement over the land or to Pickering's chance of success in the litigation. According to the complaint, the expert drafted such a second report,[5] and Bochetto showed only that report to Pickering, causing Pickering to believe that it had a good chance of prevailing in the litigation.

Some time after he filed the malpractice complaint against Bochetto, Gibson faxed a copy of the complaint to Donna Dudick, a freelance reporter who regularly writes stories for *The Legal Intelligencer*, a daily legal publication serving the Philadelphia region. Thereafter, on October 20, 1999, *The Legal Intelligencer* published an article detailing the allegations in the complaint.[6] *See* Donna Dudick, *Fox Hunting Club Takes Aim at Former Attorney: Defendant Calls Action "Garbage"*, The Legal Intelligencer, October 20, 1999, at S3, S11. Bochetto and Bochetto & Lentz subsequently filed an action against Gibson and Kassab, Archbold & O'Brien in the Court of Common Pleas of Philadelphia County.[7] In the complaint, Bochetto and Bochetto & Lentz alleged that the malpractice complaint filed by Gibson contained false and defamatory statements and that Gibson and his firm were therefore liable for defamation, commercial disparagement, and interference with contract for sending a copy of the complaint to Dudick.[8] Thereafter, Gibson and his firm filed a

5. Notably, the expert's estimation of the value of Pickering's interest in the land at issue also significantly increased in the second report.

6. ·In addition to relating the contents of the complaint, the article included statements by both Bochetto and Gibson about the lawsuit.

7. Kassab, Archbold & O'Brien was named as a defendant on the theory that it was vicariously liable for acts in which Gibson engaged.

8. In the complaint, Bochetto and Bochetto & Lentz also alleged that Gibson was liable for defamation, commercial disparagement, and interference with contract for: (1) making defamatory statements to a reporter for *The Legal Intelligencer* that were published in the October 20th article; (2) sending an e-mail with defamatory comments to Bochetto's legal malpractice insurance carrier about negotiating a settlement; and (3) sending a letter to Bochetto & Lentz and others asserting that the firm was in violation of the Rules of Professional Conduct for failing to send Gibson one of Pickering's legal files as part of discovery.

motion for summary judgment, arguing, among other things, that the judicial privilege provided him with absolute immunity for his act of sending the malpractice complaint to Dudick.[9]

On March 13, 1999, the trial court entered an order granting the motion for summary judgment and thereby dismissing Bochetto's complaint. In its opinion accompanying its order, the trial court explained that it concluded that Gibson's act of sending Dudick the malpractice complaint was protected by the judicial privilege because the document had already been filed and was available to the public. In reaching this conclusion, the court reasoned that it could not "ignore the chilling effect that could result from effectively precluding attorneys from forwarding copies of the pleadings they have filed to the press."[10] *Bochetto v. Gibson*, 2002 WL 434551, *4 (Pa.Com. Pl. March 13, 2002). Bochetto and his firm appealed from the trial court's order, and on March 14, 2003, the Superior Court entered an order and memorandum opinion affirming the trial court's order based on the reasoning expressed in the trial court's opinion. Judge Cavanaugh filed a dissenting statement, in which he stated, without further explanation, that he disagreed with the trial court's decision to grant summary judgment in favor of Gibson and Kassab, Archbold & O'Brien.

Bochetto and his firm subsequently filed a petition for allowance of appeal with this Court, arguing that the lower courts erred in, among other things, finding that Gibson's act of sending the malpractice complaint to Dudick was protected

**9.** Gibson and his firm also argued that he was entitled to summary judgment for his act of sending his malpractice complaint to Dudick because he was entitled to conditional or qualified immunity and because the allegations in the malpractice complaint were incapable of defamatory meaning. Gibson further sought summary judgment with respect to the other allegations in Bochetto's complaint, *see supra* n. 8, claiming that those claims failed as a matter of law because he was entitled to either absolute immunity or conditional immunity, and because none of his statements at issue were defamatory.

**10.** The trial court also found that Gibson was not liable for: (1) his statements to the reporter for *The Legal Intelligencer* that were included in the October 20th article because those statements were not defamatory; and (2) his statements in the e-mail to Bochetto's malpractice insurance carrier and in the letter to Bochetto & Lentz because both of those documents were protected by the judicial privilege.

by the judicial privilege. We granted allocatur to address this issue and now hold that the lower courts did err in concluding that the act of sending the complaint was within the scope of the judicial privilege.[11]

 Pursuant to the judicial privilege, a person is entitled to absolute immunity for "communications which are issued *in the regular course of judicial proceedings* and which are *pertinent and material to the redress or relief sought.*" [12] *Post v. Mendel*, 510 Pa. 213, 507 A.2d 351, 355 (1986) (emphasis in original). This privilege is based on the "public policy which permits all suiters, however bold and wicked, however virtuous and timid, to secure access to the courts of justice to present whatever claims, true or false, real or fictitious, they seek to adjudicate." *Id.* As we explained in *Post*, "[t]o assure that such claims are justly resolved, it is essential that pertinent issues be aired in a manner that is unfettered by the threat of libel or slander suits being filed." *Id.* Notably, this privilege is extended not only to parties so that they are not deterred from using the courts, but also to judges so that they may "administer the law without fear of consequences," "to witnesses to encourage their complete and unintimidated testimony in court, and to counsel to enable him to best represent his client's interests." *Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53, 56 (1971).

In *Post*, this Court was asked to decide whether the judicial privilege protected an attorney from liability for statements he

11. Bochetto and his firm also argued in their petition for allowance of appeal that the lower courts erred in finding that Gibson's statements in the e-mail to Bochetto's legal malpractice insurance carrier and in the letter to Bochetto & Lentz were protected by the judicial privilege. *See supra* n. 10. Although we granted allocatur to consider these issues in addition to the application of the judicial privilege to Gibson's act of sending the complaint to Dudick, Bochetto conceded during oral argument that the lower courts had properly determined that the judicial privilege protected these statements in the e-mail and the letter. Therefore, we see no need to consider these issues further. *See In re Gross*, 476 Pa. 203, 382 A.2d 116, 119 (1978) (court will generally only decide issues if an actual controversy regarding the issue exists).

12. A person who is entitled to absolute immunity cannot be liable for his communication regardless of his intent. *See Barto v. Felix*, 250 Pa.Super. 262, 378 A.2d 927, 929 n. 2 (1977).

made in a letter detailing alleged acts of misconduct by his opposing attorney, which was not only sent to the opposing attorney, but was also sent as copies to the judge trying the case, the Disciplinary Board of this Court, and the attorney's client. Although we found that the letter had been issued during the course of the trial and referred to matters that occurred during the trial, we nevertheless concluded that it was not: (1) issued as a matter of regular course of the proceedings; or (2) pertinent and material to the proceedings.[13] Accordingly, because the letter did not satisfy these two significant criteria for application of the judicial privilege, we held that it was not "within the sphere of [communications] which judicial immunity was designed to protect" and that the attorney was not absolutely immune from liability for his statements in the letter. *Post*, 507 A.2d at 356 (the judicial privilege "is not a license for extra-judicial defamation, and there is unnecessary potential for abuse if letters of the sort written in this case are published with impunity").

 In applying the above principles from *Post* to the instant case, we initially note that Gibson's publication of the complaint to the trial court was clearly protected by the privilege as it was not only (1) issued as a regular part of the legal proceedings, but was also (2) pertinent and material to the proceedings. *See Greenberg v. Aetna Ins. Co.*, 427 Pa. 511, 235 A.2d 576, 577–78 (1967) (allegations in answer to complaint were protected by judicial privilege). However, the fact that the privilege protects this first publication does not

13. In finding that the letter did not satisfy these two criteria, we explained as follows:

> The letter did not state or argue any legal position, and it did not request any ruling or action by the court. Nor did the communication request that anything contained in it should even be considered by the court. The letter was clearly not a part of the judicial proceedings to which it made reference, and merely forwarding a copy of the letter to the court did not make it a part of those proceedings. Likewise, forwarding copies of the letter to plaintiff's alleged client ... and to the Disciplinary Board ... did not render the letter a part of the trial proceedings, and transmittal of those copies would not logically have been expected to affect the course of trial.

*Post*, 507 A.2d at 356.

necessarily mean that it also protects Gibson's later act of republishing the complaint to Dudick. *See Pawlowski v. Smorto*, 403 Pa.Super. 71, 588 A.2d 36, 41 n. 3 (1991) ("[E]ven an absolute privilege may be lost through overpublication.... In the case of the judicial privilege, overpublication may be found where a statement initially privileged because made in the regular course of judicial proceedings is later republished to another audience outside of the proceedings."); *Barto v. Felix*, 250 Pa.Super. 262, 378 A.2d 927, 930 (1977) (although allegations in attorney's brief were protected by judicial privilege, attorney's remarks concerning contents of brief during press conference were not likewise protected by privilege).[14] Indeed, this later act may only be protected by the judicial privilege if it meets the two elements that we held in *Post* are critical for the privilege to apply, *i.e.*, (1) it was issued during the regular course of the judicial proceedings; and (2) it was pertinent and material to those proceedings. As Gibson's act of sending the complaint to Dudick was an extrajudicial act that occurred outside of the regular course of the judicial proceedings and was not relevant in any way to those proceedings, it is plain that it was not protected by the judicial privilege.[15,16] *Compare Post*, 507 A.2d at 355; *Binder*, 275

14. Notably, the trial court distinguished *Barto* from the instant case on the basis that "it [was] likely that the attorney in *Barto* read aloud and commented on his brief at the press conference in question." *Bochetto*, 2002 WL 434551, *4. However, the opinions in *Barto* appear to contradict this finding. For example, after stating its holding, the majority quoted a case for the proposition that "[t]he *republication* of a libel, in circumstances where the initial publication is privileged, is generally unprotected." *Barto*, 378 A.2d at 930 (citation omitted; emphasis added). Moreover, the dissenting judges specifically recognized that the case involved only the attorney's restatement of what was contained in the brief. *See id.* at 936 (Spaeth, J., dissenting) ("The lower court has found in its opinion, and it is not disputed by [the police officers], that the statements '(were) no more than a reiteration of the contents of [the attorney's brief].' ").

15. While Gibson is not absolutely immune from liability for his act of sending the complaint to Dudick, he nevertheless may be entitled to qualified immunity. *See Green v. Mizner*, 692 A.2d 169, 175 (Pa.Super.1997); *Pelagatti v. Cohen*, 370 Pa.Super. 422, 536 A.2d 1337, 1343 (1987); *Barto*, 378 A.2d at 930; *see also* Restatement (Second) of Torts §§ 600, 611 (1977).

16. As noted above, in finding that Gibson's act was protected by the privilege, the trial court reasoned that a chilling effect would result if

A.2d at 56 (holding that newspaper article describing trial was not protected by judicial privilege); *Barto*, 378 A.2d at 930. We therefore reverse the Superior Court's order insofar as it affirmed the trial court's order granting summary judgment in favor of Gibson on the basis that Gibson's act of transmitting the malpractice complaint to Dudick was protected by the judicial privilege.

Justice NEWMAN did not participate in the consideration or decision of this case.

Justice CASTILLE files a dissenting opinion in which Justice BAER joins.

Justice CASTILLE, dissenting.

I believe that the trial judge, the Honorable Albert W. Sheppard, Jr., in his thoughtful and comprehensive opinion, decided this case correctly and thus, like the Superior Court panel majority, I would affirm his decision. Specifically, I agree with the lower courts that appellee Gibson's conduct in providing a copy of his filed complaint to a legal media outlet is covered by the judicial privilege and is not actionable in defamation. Because the Majority Opinion concludes otherwise, I respectfully dissent.

attorneys were not protected by the privilege for "forwarding copies of the pleadings they have filed to the press." *Bochetto*, 2002 WL 434551, *4. However, contrary to the apparent findings of the trial court, the privilege is not meant to promote the airing of pleadings to the media. Rather, the privilege is only meant to promote the airing of issues and facts *during judicial proceedings*. *See Post*, 507 A.2d at 355–56. Thus, although the failure to apply the judicial privilege to an attorney's communication with the media may inhibit the ability of the media to access the documents filed in a case, that problem is not one that the judicial privilege was designed to remedy. We also point out, however, that the media is not unduly hindered by our holding today as it may generally obtain copies of unsealed pleadings from the clerks of court where the pleadings have been filed. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (recognizing the "general right to inspect and copy public records and documents ... including judicial records and documents"). Moreover, we feel compelled to note that the clerks of court cannot be held civilly liable for distributing such documents so long as they act in accordance with the law.

The October 20, 1999 article published in the *Legal Intelligencer*, which formed the basis for appellants' defamation complaint, contains factual background information concerning the litigation in which appellant George Bochetto, Esquire, had represented Pickering Hunt, and is then followed by a recitation of the allegations of the legal malpractice complaint which appellee Kevin Gibson, Esquire, filed on Pickering Hunt's behalf against Bochetto and his firm. Each of the allegations is attributed to the complaint, not to Gibson, although both Bochetto and Gibson granted interviews to the author of the article. None of the comments attributed to Gibson relates in any way to the substantive allegations of the malpractice complaint against Bochetto. Rather, Gibson's comments related to his claimed success rate in legal malpractice actions and his claim that most of his clients are referred to him by other attorneys. Gibson also remarked that "the lawyers that yell the loudest about being sued are usually the most guilty," an intemperate and gratuitous comment unbecoming a legal professional for sure, but one which merely expressed Gibson's opinion about the defendants in his cases generally, did not relate specifically to Bochetto, and did not touch upon the substance of the legal malpractice complaint. Thus, the sole information upon which Bochetto's defamation action could be based was the information gleaned from the four corners of the malpractice complaint which Gibson forwarded to the reporter.

*Barto v. Felix*, 250 Pa.Super. 262, 378 A.2d 927 (1977) (en banc), *appeal dismissed as improvidently granted*, 487 Pa. 455, 409 A.2d 857 (1980), which is cited with approval by the Majority here, is indeed instructive, as it involved a similar circumstance and divided the Superior Court. *Barto* involved the immunity available to "high public officials," as that immunity concerned the statements of a public defender who was representing a defendant who had been convicted of murder. After filing a brief in the case, the public defender called a press conference at which he related the contents of the brief. The brief contained statements about state police officers who had been involved in the investigation of the murder, and at

least two newspapers published the substance of the public defender's remarks. The police officers then sued the public defender, claiming that his comments had defamed them. The trial court, ruling on the public defender's preliminary objections, found that the public defender was a "high public official" and, therefore, entitled to absolute immunity for comments made in his official capacity, whether defamatory or not. Because the court found the public defender's remarks to be closely related to his official duties, the court found that the remarks were entitled to protection. The court also held that the public defender was absolutely privileged to repeat matters which were of public record.

The Superior Court, by a 4–3 vote, reversed, with the majority finding that the public defender was not entitled to the absolute immunity applicable to a "high public official" but, rather, that his privilege was the qualified privilege extended to any attorney to publish information relative to a judicial proceeding. Therefore, the majority held, the police officers were entitled to the opportunity to prove that the public defender's comments were known by him to be false or were made in reckless disregard of the truth in order to defeat the qualified privilege.

Judge Spaeth authored a lengthy dissent, which was joined in its entirety by Judge Jacobs and in part by Judge Hoffman. The dissent first concluded that the absolute privilege afforded to "high public officials" should extend to the public defender. In the alternative, the dissent concluded that the public defender should be deemed entitled to absolute judicial immunity, which is based not on "the status of the speaker but on whether the statements were made in the context of a judicial proceeding." 378 A.2d at 935 (footnote omitted). The dissent reasoned that the public defender's statements in this case were covered by this privilege because he had done nothing more than reiterate what he had already said in the post-conviction brief which had been filed:

> Shortly before the statement [the public defender] had filed a brief with the lower court in support of his client's post-conviction petition. The lower court has found in its opin-

ion, and it is not disputed by appellants, that the statements "(were) no more than a reiteration of the contents of that Brief." . . .

There is no question that the privilege extends to the brief itself; it was filed with the court in a pending proceeding, and allegations of impropriety on the part of investigating law enforcement officers are relevant to a challenge of a murder conviction. . . . There is also no question that the newspaper reports of [the public defender's] statements were themselves not actionable; they were reporting a noteworthy development in a case of wide community interest. . . . The sole question is whether [the public defender's] "reiteration of the contents of (his) (b)rief" may form the basis of a defamation action. The majority holds that the reiteration amounted to a "republication" of the privileged statements in the brief, and since this was outside the scope of the judicial proceedings, the privilege was lost. Concededly, the majority's position is supported by precedent in other jurisdictions. [citing cases].

However, I am of the opinion that at least in this case those precedents should not be followed. Since the statements could properly be made in the brief and in the newspapers, it is the act of supplying the statements in the brief to the newspapers that is held impermissible. However, once filed with the court, the brief was public information. (There is no indication that any "gag orders" were imposed upon the parties by the court.) The newspapers presumably could have asked the Prothonotary to permit them to see the brief, or they might have asked [the public defender] to give them a copy, which he might have done without making any comment. As I understand the majority's reasoning, both of these hypothetical situations would be considered prohibited republication. To me, however, they both represent legitimate methods of furnishing to the public information that is of record and both are indistinguishable from the present case. I would therefore con-

strue the privilege to include [the public defender's] activity here.

*Id.* at 936 (footnotes and citations omitted).

I am persuaded by the reasoning of the *Barto* dissent and would adopt it as the proper manner of approaching cases where, as in the case *sub judice,* the alleged defamation arises from the mere act of providing a copy of a filed judicial pleading to a third party. I recognize that there is a distasteful element of self-promotion at work when a Pennsylvania lawyer contacts a reporter in hopes of publicizing his case, and thereby his business. But the focus should be upon substance. Where the alleged defamatory aspect of the "contact" consists only of what is contained within the four corners of a record judicial pleading, I see no principled distinction, for defamation purposes, between the filed public complaint and the copy of it provided to the press. Here, Gibson did not make any published comments about the contents of the malpractice complaint he filed; he merely provided a copy of a public record to the reporter. As the *Barto* dissent similarly recognized, the reporter could just as easily have secured a copy of the malpractice complaint at the courthouse. Gibson provided nothing of substance to the reporter that was not already readily available directly from the court. As the complaint was filed in the course of a judicial proceeding, I would hold that the judicial privilege, and the important policies it promotes, *see* Majority slip op. at 5–6 (discussing *Post v. Mendel,* 510 Pa. 213, 507 A.2d 351, 355 (1986)), immunize Gibson from liability for the substance of the statements made in that complaint.

I emphasize that, had Gibson made comments to the newspaper reporter that elaborated on the allegations of the complaint in a fashion that could be deemed defamatory, those comments would not be covered by the privilege.[1] But, he did not and, because what was published in this case concerning

---

1. I should note that I do not condone the confrontational and self-promoting comments that Gibson made to the reporter, and I am distressed that a member of the bar would resort to the same. Pennsylvania attorneys should aspire to higher standards of conduct. Nevertheless, those comments are not actionable in defamation.

the legal malpractice action derived from the four corners of the filed complaint, it was, in my view, privileged. As I would affirm the courts below, I respectfully dissent.

Justice BAER joins this dissenting opinion.