# Meyers v. Sovereign Bank

*John Wendell Beavers,* for plaintiff.

*Benjamin E. Zuckerman* and *Laura J. O'Neill,* for defendants.

CARRAFIELLO, *J.,* June 6, 2007—Appellant, Lincoln Meyers, appeals from three orders of the Philadelphia Court of Common Pleas dated March 29, 2007 which granted the summary judgment motions of the appellees and denied appellant's motion for summary judgment in the above captioned matter.

## FACTUAL AND PROCEDURAL HISTORY

On April 7, 2005, appellant filed the present action asserting claims against Cozen and O'Connor, a Philadelphia law firm (Cozen), and one of the firm's attorneys, Cathi Snyder, for defamation and interference with prospective commercial advantage. The third count of the complaint charged Sovereign Bank, the law firm representing the bank, Weir and Partners LLP, and one of their attorneys, Laura J. O'Neill, Esquire, with breach of confidentiality. After the discovery deadline had passed, all

parties filed motions for summary judgment. As the court found the action frivolous and unsupported by either fact or law, the motions for summary judgment filed by the appellees were granted, and the motion for summary judgment filed by appellant was denied. This timely appeal followed.

Certain facts are uncontested by the parties and are needed to fully understand this action. Appellant's father died in 1996 and left an estate worth over $10,000,000. Trusts had been established for his wife, Mrs. Meyers, and three grown children. Appellant's mother was a trustee of the trust for appellant. Appellant, an attorney, was not named a trustee of any of the trusts nor was he an executor of his father's estate; however, Mrs. Meyers executed a power of attorney appointing him her attorney-in-fact shortly after her husband's death. Eventually, appellant and his siblings became the trustees of the marital account when the named trustees either died or resigned.

In November of 2000, appellant, using the power of attorney, secured a loan from Sovereign Bank for $346,263.36 *in his mother's name* to purchase a Rolls Royce Corniche convertible as a birthday present to her from her children.[1] Mrs. Meyers has maintained that she was unaware that her son had secured a loan in her name to buy the "present". She did not want the Corniche, so appellant arranged for it to be shipped to Florida and sold. When the vehicle was sold, the title that was transferred to the dealership unaccountably did not list Sovereign Bank as a lien holder and appellant did not inform

---

1. The Corniche was the security for the loan.

the dealership of Sovereign's security interest. In exchange for the Corniche, appellant's mother received a more modest car and a check for $61,000; appellant took title to a 2001 Aston Martin Vantage (worth over $150,000). To this date, Mrs. Meyers pays $3,225.17 a month to cover the loan arranged by appellant to purchase her "gift".[2]

In December of 2003, Mrs. Meyers filed a complaint against appellant and his siblings, alleging appellant had drained the marital trust of the majority of its assets and his siblings, as trustees, had failed in their fiduciary duties to stop him. The complaint, which included counts for fraud, conversion, and unjust enrichment, was filed by James F. Mannion, Esquire and verified by Mrs. Meyers. (See exhibit A, hereafter, the Meyers complaint.) In February of 2004, Cozen replaced Mr. Mannion as counsel for Mrs. Meyers. At approximately the same time as the Meyers complaint was filed, Mrs. Meyers, as trustee of appellant's trust, froze payments to appellant.[3]

In early February 2004, appellant met with employees of Sovereign Bank to explain that he would soon have

---

2. In 2001, appellant secured two loans from Sovereign Bank in his own name; one for $260,000 to purchase a Rolls Royce Serap, and one for $310,000 to purchase a cigarette boat, which he named Prurient Interest. He stopped making payments on those loans in November of 2003. Sovereign Bank brought suit against appellant for default in May of 2004, and was granted summary judgment in that action in July 2006.

3. The assets of the trust were to be turned over to appellant. Mrs. Meyers, as trustee, froze the payments from the trust to do an accounting of the assets before dispersing the funds.

trust assets available to resume payment of his loan obligations, and he mentioned there were suits pending between family members in Montgomery County. When no further payment was received, Sovereign retained Weir and Partners on March 5, 2004 to handle the matter of appellant's delinquent loans.

Mr. Weir learned that Ms. Snyder of Cozen represented Mrs. Meyers in the Meyers complaint and attempted to reach her. On March 8, 2004, she returned his call. According to both parties, Ms. Snyder informed Mr. Weir that he would have to get a copy of the complaint through the court system. Mr. Weir stated that the bank was concerned about the location of the Corniche. Ms. Snyder informed him that to the best of her knowledge, the car had been transported to Florida and traded in for a car for appellant, a car for Mrs. Meyers and cash.[4]

Ms. Snyder and other attorneys at Cozen actively investigated appellant's financial interests in an attempt to discover what had happened to their client's (Mrs. Meyers) assets. Mr. Weir and his associates conducted similar investigations on behalf of Sovereign Bank. When Sovereign Bank was forced to sue appellant for default on his loans, a litigation package, which included information about appellant's default and current financial

---

4. Sovereign Bank brought an action against Mrs. Meyers for breach of contract for selling the collateral for the loan issued in her name. As she denied knowing of the loan and, accordingly, claims she was unaware that she was improperly disposing of the collateral for that loan, Sovereign Bank's motion for summary judgment in that matter was denied.

difficulties, was given to former officers of the bank who had been responsible for processing the loans.

Appellant brought this action charging the appellees with defamation, interference with prospective commercial advantage and breach of confidentiality. A thorough review of the voluminous documentation accompanying the motions for summary judgment convinced this court that appellant's allegations consist of such misrepresentations that appellant's actions should not only suffer summary judgment but further, should never have been brought in the first place.[5]

## LEGAL DISCUSSION

Summary judgment is properly granted under Pa.R.C.P. 1035 when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In determining whether to grant summary judgment, a court must review the record in a light most favorable to the non-moving party. *Bethlehem Steel Corporation v. MATX Inc.,* 703 A.2d 39 (Pa. Super. 1997).

When a summary judgment motion is supported by admissions of the opposing parties' own witnesses, the motion may be granted based on oral testimony alone. *Lineberger v. Wyeth,* 894 A.2d 141 (Pa. Super. 2006). In order to overcome the motion, the opposing party must point to specific facts in the record demonstrating genu-

5. Because of the number of suits between the same parties and the huge amount of documentation involved in this motion, the facts as summarized above are this court's attempt to simplify the convoluted fact pattern.

ine issues of material fact. Mere assertions are insufficient to meet that burden, *McCain v. Pennbank,* 379 Pa. Super. 313, 549 A.2d 1311 (1988); neither will disputed facts which are not critical to the issues preclude summary judgment. See *Larsen v. Philadelphia Newspapers Inc.,* 411 Pa. Super. 534, 602 A.2d 324 (1991).

### A. *The Cozen and O'Connor/Cathi Snyder Motion for Summary Judgment*

Cozen and Cathi Snyder moved for summary judgment, alleging that there was no factual or legal basis for appellant's allegations of defamation or interference of prospective commercial advantage. Although the firm conducted an investigation of appellant's financial affairs in the course of their representation of Mrs. Meyers (see exhibit A, the Meyers complaint), there is no evidence to support the allegation that any attorney at Cozen made defamatory remarks. Nor was there evidence to support the contention that persons or entities contacted by Cozen subsequently made decisions adverse to appellant's interests based on the firm's contact.

Appellant, in his deposition, named Mr. Alan S. Fellheimer of the Pennsylvania Business Bank as a person who had intended to loan appellant funds for a building project, but changed his mind after a discussion with Ms. Snyder regarding the Meyers complaint. Even though named as a witness who would support his assertions, Mr. Fellheimer's deposition testimony directly refuted appellant's allegations.

According to Mr. Fellheimer's testimony, Pennsylvania Business Bank loaned appellant's company (which is solely owned by appellant) over $300,000, which the

company had defaulted on in early 2003. On March 18, 2003, the bank confessed judgment against the company in the amount of $395,385.06. Subsequently, appellant asked Mr. Fellheimer if he could help him remove the judgment:

"At some point, I had a conversation with Mr. Meyers. He came to see me. The judgment was causing him great difficulty, would hinder his ability to pay us, could we possibly get it off his credit. Favor—could we do him a favor. I made a humongous mistake, and I did him a favor. And one of the biggest mistakes I've ever made was, you know, doing Lincoln favors. I'll tell you that. No good deed goes unpunished with Lincoln.

"I agreed to write him a letter—the only way you can get it off the credit report is to say it was done in error. . . . I wrote a letter for him saying it was done in error, simply as a favor to him to help him get out of his problems. He stuck that so far up my whatever, I can't tell you. He's threatened me with it. He has used it against me every way he can. . . . Anytime I've ever done him a favor, he has done nothing but hurt me by it, and that's what happened in this case.

"He asked me for that letter. I wrote that letter. I gave it to him to try to help him. . . . And after that we decided to sell the loan because we didn't think Mr. Meyers was ever going to pay us and he used that against them, and then threatened to sue the bank because the judgment was still there. It was never our intention to give up the judgment, but he threatened to sue me because I had written the letter. I didn't want the bank involved in litigation. I ended up having to personally buy that

loan back from the people we sold it to." (C&O'C motion for SJ, exhibit 19 at pp. 52-53.)

Mr. Fellheimer further testified that the bank never reviewed or reached any decision as to whether it would make any additional loans to appellant, as appellant informed Mr. Fellheimer that he had arranged for alternate financing. In fact, it is quite apparent that if Mr. Fellheimer or his bank ever elected not to deal with appellant, the decision would be based on Mr. Fellheimer's personal knowledge of appellant's dishonest practices, and not on any disclosures made by the appellees.

Appellant also alleged in his complaint that it was Cozen's actions which caused Sovereign Bank to sue him for default on his loans. What is clear from the record is that Sovereign Bank had referred the matter to the Weir firm for collection on the defaulted loans *prior* to any contact between Weir and Cozen. The only admissible evidence clearly demonstrated that it was appellant's default on several major loans which caused the damage to his business reputation.

To support a tortious interference claim, the plaintiff must satisfy four elements: (1) the existence of a contractual or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. *Al Hamilton Contracting Co. v. Cowder,* 434 Pa. Super. 491, 497, 644 A.2d 188, 191 (1994). Appellant's claims do not satisfy any of the elements, as ap-

pellant failed to show that Cozen's actions, rather than his own failure to pay his creditors, caused the damage to his credit and his ability to secure future loans.

It is also the law in Pennsylvania that statements made by counsel in the course of litigation are absolutely privileged, and cannot form the basis for a defamation suit. *Binder v. Triangle Publications Inc.,* 442 Pa. 319, 275 A.2d 53 (1971); *Bochetto v. Gibson,* 580 Pa. 245, 860 A.2d 67 (2004). Any calls made by members of the Cozen firm were directly related to their investigation of appellant's assets and liabilities in support of his mother's suit against him.[6] Further, nothing in the record supports appellant's claim that they were made to, or in fact did, damage his reputation. The litigation privilege extends to any conversation conducted by Cozen's attorneys in furtherance of their representation of Mrs. Meyers, and the record does not establish that any action taken by Cozen abused that privilege.

### B. *The Sovereign Bank, Weir & Partners LLP, and Laura J. O'Neill Motion for Summary Judgment*

Appellant defaulted on two large loans held by Sovereign Bank. Sovereign Bank hired Weir & Partners LLP (Weir) to attempt to collect on those loans. Sovereign Bank gave Weir a copy of its entire file on appellant, including loan documents, internal memos, etc. In the course of investigating appellant's loans, Weir learned that the Corniche, the car which had served as security

---

6. Although appellant claims the Meyers complaint was completely defamatory, he did not sue his mother, who verified the complaint, nor the attorney who drafted it.

for the loan appellant had signed for in his mother's name, was missing. Weir discovered the Corniche had been transported to Florida and sold without notice to, or approval by, Sovereign Bank. After concluding the firm's investigation, Weir filed suits on Sovereign Bank's behalf against appellant for defaulting on his loans and against appellant's mother for breach of contract.

In the course of the Sovereign Bank litigation, three former officers of the bank who had been involved when the loans were originally processed were given a package of documents to review by Ms. O'Neill, an attorney at Weir. Contained in the documents was a memo stating that appellant expected to have access to his trust fund assets to pay the loans, as well as documents showing he was in default.

Appellant claims Sovereign Bank breached a duty of confidentiality when it gave his personal financial information to the firm representing the bank in trying to collect on appellant's defaulted loans. However, nothing in Pennsylvania law can be interpreted as preventing a lending institution from using this type of information to enforce its contractual rights as a creditor.

The case cited by appellant in support of his claim, *Heritage Surveyors & Engineers Inc. v. National Penn Bank*, 801 A.2d 1248 (Pa. Super. 2002), supports a bank's refusal to inform another creditor of a borrower's default. That case held that informing the other creditor would be a breach of the confidentiality owed a borrower. But in no way does that case stand for the proposition that a bank cannot hire a law firm to enforce its own contractual rights.

A borrower who has defaulted on a loan has little expectation that his financial affairs will remain private in the course of the litigation that ensues as a result of the default. Weir was entitled to review the bank's records and prepare for the litigation. The information in the litigation package sent to former officers of the bank for review in anticipation of being called as witnesses was all directly related to the litigation over the loans.[7] As the litigation itself was based on appellant's defaults, it was to be expected that the documents would reveal those defaults and would contain whatever information had been offered by appellant as the reason for his financial difficulties.

As discussed previously in this decision, the judicial privilege is recognized in Pennsylvania as being an essential element of free access to the court system—allowing the exploration of claims without fear of a defamation claim. The same public policy would be violated if a court held that a firm representing a creditor in a default could not investigate or prepare the case.

## C. *Lincoln Meyers' Motion for Summary Judgment*

This court, for the reasons stated above, found that there were no genuine issues of fact, nor did the law support this cause of action against appellees. Accordingly, the court denied appellant's motion for summary judgment.

---

7. Two of the employees have yet to be deposed; however, Weir and Sovereign Bank conceded that they had received the package. As all parties filed motions for summary judgment, it was the court's conclusion that the issue was ripe for decision.

## CONCLUSION

The undisputed conduct of appellant in this matter should be embarrassing to him. It is understandable that appellant should feel aggrieved at any recounting of these sordid details. As a son, a fiduciary and an attorney, he has violated trusts and has alone generated a reputation for despicable behavior. As if that were not enough, he now attempts to seek "damages" from those who were taking appropriate steps to recoup the losses he caused. This cannot be permitted as appellees have occasioned him no damage and have only disseminated the truth to those who had a privilege to receive it.

Wherefore, for all the reasons stated above, the orders of this court granting appellees' motions for summary judgment and denying appellant's motion for summary judgment should be affirmed.

## EXHIBIT A

## NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within 20 days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered

against you by the court without further notice for any money claimed in the complaint or for any other relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Reference Service
409 Cherry Street
Norristown, PA 19401
(610) 279-9660 Ext. 201

## COMPLAINT

### *Parties*

(1) Plaintiff, Lillian F. Meyers, is an adult individual residing at 237 Fairview Road, Lower Merion Township, Montgomery County, Pennsylvania. As set forth in more detail below, plaintiff brings this action in her individual capacity, as executor of the will of her deceased husband, Edward B. Meyers, and as trustee of the marital trust created under the will of Edward B. Meyers.

(2) Defendant, Lincoln Meyers, is an adult individual residing at 1650 Oak Wood Drive, Penn Valley, Montgomery County, Pennsylvania. As set forth in more detail below, Lincoln Meyers, served as attorney-in-fact for plaintiff under general powers of attorney, and served as agent for the executors of the will of Edward B. Meyers, deceased, and as agent for the trustees of the marital trust created under the will of Edward B. Meyers.

(3) Defendant, Robert A. Meyers, is an adult individual residing at 636 Spruce Lane, Villanova, Montgomery County, Pennsylvania. As set forth in more detail below, Robert A. Meyers serves as co-executor of the will of Edward B. Meyers, deceased and as co-trustee of the marital trust created under the will of Edward B. Meyers.

(4) Defendant, Leslie R. Meyers, is an adult individual residing at 530 Park Avenue, Apt. 5F, New York, New York. As set forth in more detail below, Leslie R. Meyers serves as co-executor of the will of Edward B. Meyers, deceased and as co-trustee of the marital trust created under the will of Edward B. Meyers.

## Jurisdiction and Venue

(5) This court has original jurisdiction over this matter pursuant to 42 Pa.C.S. §931.

(6) Venue lies in this county pursuant to Pa.R.C.P. 1006(a) because the cause of action occurred in Montgomery County.

## Background

(7) Edward B. Meyers (decedent) was a successful businessman and residential builder in the Philadelphia metropolitan area.

(8) Decedent married plaintiff, Lillian F. Meyers, and together they had three children, defendants Lincoln Meyers, Robert A. Meyers and Leslie R. Meyers.

(9) Decedent died suddenly on September 1, 1996. Decedent's will dated July 16, 1996 was probated by the Register of Wills of Montgomery County, Pennsylvania,

on September 12, 1996 and letters testamentary were granted thereon to Lillian, Zita Phillips, Alvin Block and Henry F. Miller as executors. Exhibit A.

(10) In 1997, Zita Phillips resigned as co-executor and was replaced by Robert as executor. In 2000, Alvin Block and Henry F. Miller resigned as executors and were replaced by Leslie as executor.

(11) Under decedent's will dated July 16, 1996, following certain specific pre-residuary bequests, the residue of decedent's estate is divided into a "marital portion" and a "non-marital portion." The non-marital portion consisting of decedent's federal estate tax exemption amount, was distributable in equal shares to Lincoln, Robert and Leslie. The marital portion, consisting of the remaining assets of the estate, are held in trust for Lillian during her lifetime (the marital trust).

(12) Concurrently with their resignations as co-executors, Zita Phillips, Alvin Block and Henry F. Miller renounced their right to serve as trustees of the marital trust.

(13) The trustees of the marital trust are Lillian, Robert and Leslie.

(14) The gross value of decedent's estate as of decedent's date of death was more than $11.5 million.

(15) As of 2000, the marital trust was funded with and/or due assets from the estate of approximately $7 million.

*Lincoln Obtains Lillian's Power of Attorney*

(16) Lillian was distraught following decedent's death on September 1, 1996.

(17) Decedent had handled the family finances and businesses and Lillian was not experienced in such matters.

(18) Lincoln, a licensed Pennsylvania attorney and a successful businessman, persuaded his mother to allow him to handle the family finances.

(19) Lillian trusted Lincoln and relied upon him to act in her best interests.

(20) By general durable power of attorney dated October 14, 1996, Lillian appointed Lincoln her attorney-in-fact. Exhibit B.

(21) Lillian executed another power of attorney on November 11, 1997, appointing Lincoln as her attorney-in-fact. Exhibit C.

(22) At all times relevant hereto, Lincoln was in a confidential relationship with Lillian, and owed her a fiduciary duty not to engage in self-dealing and to act solely in her best interests.

*Lincoln Implements an "Estate Plan", Depleting Lillian's Assets Under the Guise of Saving Taxes*

(23) Lincoln devised an "estate plan" wherein Lillian would transfer ownership of her assets to defendants in an effort to reduce or eliminate taxes upon Lillian's death.

(24) Lincoln represented to Lillian that she would still control, and for all intents and purposes "own", the assets transferred, but legal title would be transferred to defendants.

## *The Fairview Road Property*

(25) By deed dated December 26, 1997, Lillian "sold" her residence at 237 Fairview Road, Lower Merion Township, to her children Lincoln, Robert and Leslie. Exhibit D.

(26) Despite that the "sale" of the property was allegedly for consideration of $510,000 and despite that a "demand note" for such amount was prepared, Lincoln, Robert and Leslie never signed the note.

(27) Defendants considered, and still consider, the Fairview Road property to belong to Lillian notwithstanding the December 26, 1997 deed.

(28) From December 26, 1997 and to this day, Lillian continues to reside in the Fairview Road property as her residence.

(29) The "sale" of the Fairview Road property was a sham, designed by Lincoln merely to attempt to save taxes.

(30) Lillian did not, and did not intend to, make a gift of the Fairview Road property to defendants.

(31) In the spring of 1998, Lincoln, Robert and Leslie obtained a loan in the amount of $392,000 from First Republic Bank, secured by a first mortgage on the Fairview Road property.

(32) Lillian received the mortgage proceeds of $392,000. At Lincoln's direction, the proceeds were applied toward $1 million life insurance policies on her life naming each of Lincoln, Robert and Leslie as beneficiaries.

(33) At Lincoln's direction, the monthly mortgage payments for the Fairview Road property were paid by Lillian from her personal funds.

(34) Lillian did not, and did not intend to, make a gift of such mortgage payments to defendants.

(35) At Lincoln's direction, in June 2002 $365,000 was transferred from Lillian's personal funds to pay off the mortgage on the Fairview Road property.

(36) Lillian did not, and did not intend to, make a gift of the $365,000 to defendants.

(37) No federal gift tax return was prepared or filed reflecting the transfer of the Fairview Road property to defendants, the monthly mortgage payments or the pay-off of the mortgage.

### The Oak Hill Condominiums

(38) In the fall of 2000 Lillian was diagnosed with a severe cardiac condition requiring two heart valve replacements.

(39) Under the guise of saving death taxes, Lincoln persuaded Lillian to transfer title to three condominium apartments she owned at the Oak Hill Condominiums in Lower Merion Township, Montgomery County.

(40) Lincoln had his attorneys prepare deeds transferring condominium Unit E-308 to Lincoln, transferring condominium Unit W-313 to Robert, and transferring condominium Unit E-309 to Leslie. Exhibit E.

(41) Lincoln brought the deeds to Lillian at the Fairview Road property and insisted that she sign them, given her health, and in order to save taxes. Lincoln then

brought the signed deeds to his attorney and had a notary in that office, who was not present when Lillian signed the deeds, take the acknowledgment falsely stating that Lillian had personally appeared before her.

(42) The deeds recite consideration of $1; in fact no consideration was paid to Lillian for the transfer of the condominiums to defendants.

(43) Defendants considered, and still consider, the Oak Hill Condominiums to belong to Lillian, notwithstanding the execution of the deeds.

(44) The transfers of Oak Hill Condominiums were a sham, designed by Lincoln merely to save taxes.

(45) Lillian did not, and did not intend to, make a gift of such condominiums to defendants.

(46) No federal gift tax return was prepared or filed reflecting the transfer of the condominiums to defendants.

## The Boca Raton Condominium

(47) Under the guise of saving death taxes, Lincoln persuaded Lillian to transfer title to her condominium apartment located at 6301C Graycliff Drive, Unit 19C, Boca Raton, Florida, to Lincoln, Robert and Leslie.

(48) No consideration was paid to Lillian for the transfer of the Boca Raton Condominium to defendants.

(49) Defendants considered, and still consider, the Boca Raton condominium to belong to Lillian.

(50) The transfer of Boca Raton condominium was a sham, designed by Lincoln merely to save taxes.

(51) Lillian did not, and did not intend to, make a gift of the Boca Raton condominium to defendants.

(52) In December 2000, Lincoln, Robert and Leslie obtained a loan in the amount of $250,000 from First Republic Bank, secured by a first mortgage on the Boca Raton property.

(53) At Lincoln's direction, the monthly mortgage payments for the Boca Raton condominium were paid by Lillian from her personal funds.

(54) Lillian did not, and did not intend to, make a gift of such mortgage payments to defendants.

(55) At Lincoln's direction, in May of 2001 assets were transferred from Lillian's personal funds to pay off the mortgage on the Boca Raton condominium.

(56) Lillian did not, and did not intend to, make a gift of the mortgage payoff to defendants.

(57) No federal gift tax return was prepared or filed reflecting the transfer of the Boca Raton condominium to defendants, the monthly mortgage payments or the payoff of the mortgage.

*Lincoln, As Lillian's Attorney-in-Fact, and*
*As Agent for the Executors and Trustees,*
*Converts Millions of Dollars for His Own Benefit*

*Transfers From Lillian's Assets to or for*
*the Benefit of Lincoln*

(58) As attorney-in-fact for Lillian, Lincoln converted nearly $500,000 of Lillian's personal assets, either directly to himself or for his benefit, including:

(a) Transferring $352,907.78 to his Salomon Smith Barney account in October 2000;

(b) Transferring $16,628 to his Salomon Smith Barney account in October 2000;

(c) Transferring $82,000 and $5,000 to PNC Bank in February 2001 and May 2002, respectively, believed to be on account of debts Lincoln owed to such institution;

(d) Transferring $15,000 to Sovereign Bank in May 2002, believed to be on account of debts Lincoln owed to such institution;

(e) Transferring $10,000 to Atlantic Central Bank in May 2002, believed to be on account of debts Lincoln owed to such institution; and

(f) Transferring $5,000 to his IRA account at Salomon Smith Barney in August 2002.

(59) Lincoln also obtained an unsecured loan in the amount of $250,000 from Lillian in September 2000, which loan has not been repaid despite demand therefor.

*Lincoln Gives His Mother a "Gift" of a*
*Rolls Royce Paid for by a Loan He Obtains*
*in Her Name As Attorney-in-Fact*

(60) In November 2001, Lincoln, as attorney-in-fact for Lillian under the October 14, 1996 power of attorney, obtained a loan from Sovereign Bank in the amount of $346,263.36.

(61) Lincoln used a portion of the loan proceeds to pay off Lillian's existing car loan, and used the balance

to purchase Lillian a 2000 Rolls Royce Corniche as a "gift" for her 65th birthday.

(62) Lillian informed Lincoln that she did not want such an extravagant automobile, and asked him to return or trade in the automobile.

(63) On or about December 14, 2000, Lincoln took the Rolls Royce to Florida, and traded the automobile in to Palm Beach Motor Cars Ltd., receiving a credit of $288,000.

(64) Of the $288,000 "credit", $61,112.26 was returned to Lillian, and Lincoln used the balance of the credit to purchase a 2001 Aston Martin Vantage in his own name.

(65) Lincoln failed to advise Palm Beach Motors Ltd. that Sovereign Bank had a lien on the car to secure its loan in the amount of $346,263.36.

(66) Sovereign Bank still believes it has a lien on the Rolls Royce and that it is still owned by Lillian.

(67) Lillian has been forced to pay Sovereign Bank $3,225.17 per month on account of the loan for her "gift" which was later transformed into Lincoln's personal automobile.

### Lincoln Converts Assets of the Estate and Marital Trust

(68) In addition to serving as Lillian's attorney-in-fact, Lincoln served as the agent of the executors of the will of Edward B. Meyers, deceased, and as the agent of the trustees of the marital trust.

(69) As agent of the executors and trustees, Lincoln was authorized to, and did, engage in securities transactions in the brokerage accounts held by the executors and trustees.

(70) As agent, Lincoln owed fiduciary duties to the executors and trustees.

(71) Commencing at approximately the time of the resignation of Messrs. Block and Miller, as referenced in paragraph 10 above, Lincoln exceeded his authority as agent, abused his position of trust, violated his fiduciary obligations to the executors and trustees, and engaged in self-dealing transactions as set forth below.

### Transfers from Estate to or for the Benefit of Lincoln

(72) At Lincoln's direction as agent, during the period from December 2000 through May 2001, more than $315,000 was transferred from the estate to Lincoln's personal bank account at First Union National Bank.

(73) At Lincoln's direction as agent, during the period from November 1999 through March 2000, more than $190,000 was transferred from the estate to Lincoln's personal account and/or personal loan account at PNC Bank.

(74) At Lincoln's direction as agent, in April 2001 assets worth more than $735,000 were transferred from the estate to a trust for Lincoln's benefit.

(75) The executors did not, and could not, authorize the transfers to or for the benefit of Lincoln as aforesaid, because Lincoln was not a beneficiary of the estate.

(76) Lincoln, as agent, was not authorized to transfer such sums, and exceeded the scope of the authority granted to him by the executors.

(77) By directing the transfers as aforesaid, Lincoln abused his position of trust and violated his fiduciary obligations to the executors.

(78) Lincoln's actions as aforesaid constitute impermissible self-dealing by an agent.

(79) Robert and Leslie as executors, have failed to bring suit against Lincoln for his actions as aforesaid, in breach of their fiduciary obligations to the estate and its beneficiaries, including specifically Lillian.

### *Transfers From Marital Trust to or for the Benefit of Lincoln*

(80) At Lincoln's direction as agent, during the period from June 2001 to August 2002, more than $57,000 was transferred from the marital trust to or for the benefit of Lincoln, including:

(a) $10,000 transferred to North Penn Bank in June 2001, believed to be on account of debts Lincoln owed to such institution;

(b) $2,500 transferred to PNC Bank in January 2002, believed to be on account of debts Lincoln owed to such institution;

(c) $5,498.51 transferred to Republic First Bank in June 2002, believed to be on account of debts Lincoln owed to such institution; and

(d) $40,000 transferred to Lincoln's IRA account at Salomon Smith Barney in August 2002.

(81) Upon information and belief, additional assets were transferred from the marital trust to or for the benefit of Lincoln.

(82) The trustees did not, and could not, authorize the transfers to or for the benefit of Lincoln as aforesaid.

(83) Lincoln, as agent, was not authorized to transfer such sums, and exceeded the scope of the authority granted to him by the trustees.

(84) By directing the transfers as aforesaid, Lincoln abused his position of trust and violated his fiduciary obligations to the trustees.

(85) Lincoln's actions as aforesaid constitute impermissible self-dealing by an agent.

(86) Robert and Leslie as trustees, have failed to bring suit against Lincoln for his actions as aforesaid, in breach of their fiduciary obligations to the marital trust and its beneficiaries, including specifically Lillian.

(87) By permitting Lincoln to act as aforesaid and without recourse, the trustees have jeopardized the tax status of the marital trust.

### Marital Trust Margin Account

(88) The marital trust currently has liquid assets worth approximately $3,146,353.

(89) In order to raise cash which he later converted for himself or his benefit, Lincoln as agent took margin loans against the marital trust's brokerage account.

(90) The margin on the marital trust's brokerage account is presently $2,223,340, leaving a net value of only approximately $923,013.

(91) Lillian's personal assets have been depleted to the point where she has virtually no liquid assets.

(92) The interest cost of the margin loan has more than negated any income earned by the investments in the marital trust.

(93) Upon information and belief, the bulk of the $2.2 million margin loan was transferred to or for the benefit of Lincoln.

Count 1—Lillian v. Lincoln
Accounting As Attorney-in-Fact

(94) Plaintiff incorporates the allegations of paragraphs 1 through 93 of the complaint as if fully set forth herein.

(95) Lincoln breached his fiduciary duty as attorney-in-fact for Lillian.

Wherefore, plaintiff requests that this honorable court direct defendant Lincoln Meyers to file an account of his stewardship as attorney-in-fact for Lillian and grant such other relief as the court deems appropriate.

Count 2—Lillian v. Lincoln
Accounting As Agent for Executors

(96) Plaintiff incorporates the allegations of paragraphs 1 through 95 of the complaint as if fully set forth herein.

(97) Lincoln breached his fiduciary duty as agent for the executors.

Wherefore, plaintiff requests that this honorable court direct defendant Lincoln Meyers to file an account of his

stewardship as agent for the executors and grant such other relief as the court deems appropriate.

## Count 3—Lillian v. Lincoln
### Accounting As Agent for Trustees

(98) Plaintiff incorporates the allegations of paragraphs 1 through 97 of the complaint as if fully set forth herein.

(99) Lincoln breached his fiduciary duty as agent for the trustees.

Wherefore, plaintiff requests that this honorable court direct defendant Lincoln Meyers to file an account of his stewardship as agent for the trustees and grant such other relief as the court deems appropriate.

## Count 4—Lillian v. Lincoln
### Conversion

(100) Plaintiff incorporates the allegations of paragraphs 1 through 99 of the complaint as if fully set forth herein.

(101) Lincoln intentionally deprived Lillian, the estate and marital trust of its use and possession of its assets without Lillian's, the executors' or the trustees' consent and without lawful justification.

(102) Lillian, the estate and the marital trust have been damaged by Lincoln's actions.

Wherefore, plaintiff requests judgment against the defendant Lincoln Meyers in an amount in excess of $50,000, together with attorney fees and costs of suit, and such other relief as the court deems appropriate.

### Count 5—Lillian v. Lincoln
### Fraud

(103) Plaintiff incorporates the allegations of paragraphs 1 through 102 of the complaint as if fully set forth herein.

(104) Lincoln falsely represented to Lillian that the transfers to defendants of her Fairview Road Property, her Oak Hill condominiums and her Boca Raton Florida condominium, would eliminate death taxes.

(105) Lincoln falsely represented to Lillian that, despite such transfers, she would still be the "owner" of the properties and in control of the properties.

(106) Lincoln made such false representations for the purpose of obtaining a financial benefit for himself and others.

(107) At the time Lincoln made such representations, he knew them to be false.

(108) Lincoln made such representations with the intention of having Lillian rely upon such representations.

(109) Lillian justifiably relied upon Lincoln's representations.

(110) Lillian has been damaged by Lincoln's false representations.

Wherefore, plaintiff requests judgment against the defendant Lincoln Meyers in an amount in excess of $50,000, together with attorney fees and costs of suit, and such other relief as the court deems appropriate.

## Count 6—Lillian v. Lincoln
## Undue Influence (Abuse of a
## Confidential Relationship)

(111) Plaintiff incorporates the allegations of paragraphs 1 through 110 of the complaint as if fully set forth herein.

(112) Lincoln stood in a confidential relationship to Lillian.

(113) Lincoln abused his confidential relationship with Lillian by persuading her to transfer the Fairview Road property, the Oak Hill condominiums and the Boca Raton condominiums to himself and the other defendants under the guise of "estate planning."

Wherefore, plaintiff requests judgment against the defendant Lincoln Meyers in an amount in excess of $50,000, together with attorney fees and costs of suit, and such other relief as the court deems appropriate.

## Count 7—Lillian v. Lincoln
## Breach of Fiduciary Duty

(114) Plaintiff incorporates the allegations of paragraphs 1 through 113 of the complaint as if fully set forth herein.

(115) Lincoln has breached fiduciary duties as attorney-in-fact for Lillian, as agent for the executors and as agent for the trustees.

Wherefore, plaintiff requests judgment against the defendant Lincoln Meyers in an amount in excess of $50,000, together with attorney fees and costs of suit, and such other relief as the court deems appropriate.

## Count 8—Lillian v. Lincoln
## Breach of Contract

(116) Plaintiff incorporates the allegations of paragraphs 1 through 115 of the complaint as if fully set forth herein.

(117) Lincoln has failed to repay the $250,000 loan made by Lillian to him in September of 2000, despite demand therefor.

Wherefore, plaintiff requests judgment against the defendant Lincoln Meyers in an amount in excess of $50,000, together with attorney fees and costs of suit, and such other relief as the court deems appropriate.

## Count 9—Lillian v. Lincoln
## Money Had and Received

(118) Plaintiff incorporates the allegations of paragraphs 1 through 117 of the complaint as if fully set forth herein.

(119) Lincoln received converted funds, and/or the benefit of the converted funds without payment of consideration therefor.

(120) Lincoln, in equity and good conscience, have rights in the funds inferior to the rights of Lillian, the estate and the trust.

Wherefore, plaintiff requests judgment against the defendant Lincoln Meyers in an amount in excess of $50,000, together with attorney fees and costs of suit, and such other relief as the court deems appropriate.

## Count 10—Lillian v. Lincoln
## Tracing Trust Property

(121) Plaintiff incorporates the allegations of paragraphs 1 through 120 of the complaint as if fully set forth herein.

(122) Lillian, as trustee of the marital trust, has the right to trace the funds Lincoln converted and applied for his own personal benefit.

Wherefore, plaintiff requests judgment against the defendant Lincoln Meyers in an amount in excess of $50,000, together with attorney fees and costs of suit, and such other relief as the court deems appropriate.

## Count 11—Lillian v. All Defendants
## Unjust Enrichment

(123) Plaintiff incorporates the allegations of paragraphs 1 through 122 of the complaint as if fully set forth herein.

(124) It is unconscionable and inequitable for Lincoln to retain the benefit he obtained from the conversion of funds as aforesaid.

(125) Lincoln has been unjustly enriched.

(126) Lillian, the estate and the marital trust have been damaged by Lincoln's actions as aforesaid.

Wherefore, plaintiff requests judgment against the defendant Lincoln Meyers in an amount in excess of $50,000, together with attorney fees and costs of suit, and such other relief as the court deems appropriate.

## Count 12—Lillian v. All Defendants
### Constructive Trust

(127) Plaintiff incorporates the allegations of paragraphs 1 through 126 of the complaint as if fully set forth herein.

(128) Lincoln, Robert and Leslie have been unjustly enriched.

(129) A constructive trust should be imposed in Lillian's favor upon the Fairview Road property, the Oak Hill condominiums and the Boca Raton condominium.

Wherefore, plaintiff requests that the court impose a constructive trust in Lillian's favor upon the Fairview Road property, the Oak Hill condominiums and the Boca Raton condominium, and grant such other relief as the court deems appropriate.

Respectfully submitted,

/s/James F. Mannion

James F. Mannion

Dated: December 12, 2003

## VERIFICATION

I, Lillian F. Meyers, verify that the facts set forth in the foregoing pleading, to the extent based upon my personal knowledge, are true and correct, and to the extent based upon belief and/or information provided by others, after reasonable investigation are believed to be true and correct; and false statements therein are subject to the penalties of 18 Pa.C.S. §4904, relating to unsworn falsification to authorities.

/s/Lillian F. Meyers

Lillian F. Meyers

Dated: September 30, 2003