**Keahey v. Keahey**

C.P. of Delaware County, No. 2013-003741

*George B. Keahey*, pro se appellant.
*John Neumann Hickey*, for appellee.

GREEN, *J.*, Nov. 10, 2014—Appellant, George B. Keahey,[1] filed the instant appeal following orders entered on June 18, 2014 granting Wendy Keahey's motion for summary judgment and denying George B. Keahey's motion for summary judgment. Appellant's concise statement of errors complained of on appeal provides as follows:

1. The court erred in granting summary judgment to defendant on the defamation/libel count by determining that defendant has constitutional immunity protections for her defamatory/libelous statements under Pennsylvania and United States Law, because:

(a) Defendant was never a party in the Sec. 1983 Civil Litigation: *George Keahey v. Bethel Township, et al.*

(b) Defendant never was listed on the pre-trial witness list in the Sec. 1983 Civil Litigation *George Keahey v. Bethel Township, et al.* Litigation: *George Keahey v. Bethel Township, et al.* (sic)

(d) (sic) Defendant's statements were published to Bethel Township's representatives at her own volition and under her own conditions and not in court or during court or litigant ordered proceedings.

2. The court further erred in denying summary judgment for plaintiff on the defamation/libel count as a matter of law because it was uncontroverted that the statement:

(a) Was published to a third party;

(b) Applied to the plaintiff;

---

1. George B. Keahey, an attorney licensed in the Commonwealth of Pennsylvania, represents himself in this matter.

(c) It accused the plaintiff of criminal activity.

*Pennoyer v. Marriot Hotel Services*, 324 F. Supp. 2d 614, 618 (E.D.Pa. 2004)(citing *Clemente v. Espinosa*, 749 F. Supp. 672, 677 (E.D.Pa. 1990 (citing 42 Pa.C.S. § 343(a)1988))).

Appellant, George N. Keahey, and appellee, Wendy Keahey are husband and wife, in the midst of a divorce.[2] Mr. Keahey initiated the above-captioned civil matter by filing a complaint on or about April 18, 2013. Therein, he alleged "damages arising out of an affidavit published by Wendy Keahey." (Appellant's April 28, 2014 motion for summary judgment, ¶1). Mr. Keahey's civil complaint sought damages for (1) Libel/defamation pursuant to 42 Pa. C.S. §8343, (2) Libel/defamation — common law and, (3) Wrongful use of judicial proceedings pursuant to 42 § 8351. (April 18, 2013 complaint). Relevant allegations of the complaint provide as follows:

13. At all times relevant to this complaint, defendant [Wendy Keahey] knew that plaintiff [George B. Keahey] was a licensed practicing attorney who makes his living in the five counties of Pennsylvania and the USDC.

14. At all times relevant to this complaint, defendant knew that plaintiff has filed a law suit against Bethel Township and others in the USDC (*Keahey v. Bethel Township, et al*, 11-7210)[hereinafter "1983 action"].

15. Defendant knew that plaintiff was representing himself in the 1983 Action.

---

2. George Bruce Keahey v. Wendy Ann Jones Keahey, Delaware County Court of Common Pleas, 2009-015560.

16. On or about October 18, 2012, defendant executed a false and defamatory affidavit against plaintiff. A true and correct copy of the affidavit is attached hereto and incorporated herein as Exhibit "A."

17. Defendant knew that the affidavit would be publically filed in USDC.

18. Defendant knew that the Affidavit would be viewed by all counsel in the 1983 action.

19. Defendant knew that the affidavit would be viewed by any and all judges assigned in the 1983 Action.

20. The affidavit was publically filed October 23, 2012. (sic) by the Bethel defendants in an attempt at having plaintiffs litigation dismissed.

21. Defendant vindictively conspired with Bethel defendants to thwart plaintiff's success in the 1983 Action and cause him harm.

22. The affidavit is a public document and is available to view by counsel, judges and also the public at large through the USDC website.

The notarized affidavit which purportedly serves as the basis for instant civil suit was signed and dated on October 18, 2012. It provides the following:

The undersigned, Wendy Keahey, hereby deposes and says as follows:

1. I married George Keahey on September 6, 2002.

2. Because of George's credit background, the mortgage on 1584 Conchester Road was in my name only.

3. At the time of the marriage I owned a 1987 Mustang my father bought in 1988 and gave to me when I was in college.

4. I also owned a Subaru which I traded in for a Ford F-150 truck, through a discount I had as an employee of a Ford dealership. The truck and loan were in my name only.

5. Several weeks before the incident on November 25, 2009, I called police after George threw me across the kitchen when I was trying to leave to go to a friend's home.

6. George was yelling, "Go ahead, run me over!" and other things as he stood in the back of the truck preventing me from leaving. I locked myself in the truck and called police.

7. When officers arrived, one officer took George to one side of the driveway and another officer got me and my dog out of the truck.

8. In a threatening tone, George said I better get a good attorney.

9. The officer warned George that he should be careful because I wasn't pressing charges and allowed me to leave in the truck since it was in my name.

10. On the night before Thanksgiving, 2009, we had another argument. I was not drunk or under the influence of drugs.

11. George was secretly taking boxes from the home and placing them in the back of the truck which was locked and he had the only key. He refused to give me

the key so I could see what he was trying to take out of the house.

12. We were also arguing because I believed George was seeing another woman, Irene Reardon, and I confronted him about this.

13. After calling the police, I waited outside on the walkway for police to arrive and I believe George was in the sunroom.

14. When officers arrived, one asked me where George was and I believe I walked him to the sunroom and opened the door.

15. George immediately started giving the officer a hard time and was argumentative and uncooperative.

16. An officer asked me if I had somewhere I could go and I said I did not and I really didn't see why I had to leave.

17. I told the officer the mortgage was in my name alone, but the deed was in both of our names.

18. The officer with George then asked me to come inside.

19. He told me that George was willing to leave and wanted to know if George would take the truck.

20. I told the officer no, George would not take the truck and that it is in my name alone and suggested George call his girlfriend, Irene, for a ride.

21. By this point, George was no longer argumentative.

22. I went back outside and heard one of the officers

offer to give George a ride and George walked away with them.

23. I did not see any of the officers forcibly remove George from the home.

24. During this time, George was wearing the same clothes he was wearing when he left for work in the morning.

25. Early the next morning, I heard the truck being started and I saw it being driven off.

26. After seeing the truck being driven off I called police.

27. Two officers arrived and I told them what had happened the night before and that George was told he wasn't to take the truck.

28. The next thing I heard about the truck was from Officer Bradshaw who advised me that the D.A. had told them they couldn't charge George with unauthorized use and there was nothing more they could do.

29. On January 23, 2010, after George refused to return my truck, I took my truck from where it was parked on the street in front of the home of Irene Reardon.

30. When I got home, I had a message T felt was threatening from Irene Reardon (telling me I was "done".)

31. I was afraid of what they might do and called police.

32. An officer came to the house and listened to the message and said he could see how the message could be seen as threatening.

33. An order was issued in the divorce case that allowed George to use the Mustang for 30 days only. When the 30 days were up and George refused to return the Mustang, I contacted the police.

34. I did not know any of the officers at the Bethel Police.

FURTHER AFFIANT SAYETH NOT.

The affidavit was signed and dated by Wendy Keahey and notarized by Kristin Oliver, Notary Public Media Borough, Delaware County.

The instant matter was assigned to compulsory arbitration in the Court of Common Pleas of Delaware County and a report and award of arbitrators issued on January 14, 2014.[3] Following an appeal from arbitration, a trial assignment and case management order was entered or about March 28, 2014. Said order established a deadline for filing dispositive motions, including motions for summary judgment, Mr. Keahey's motion for partial summary judgment was filed on April 28, 2014 and Mrs. Keahey's motion for summary judgment was filed on May 6, 2014.

In opposition to Mr. Keahey's motion for partial summary judgment, Mrs. Keahey apprised the trial court of the factual underpinnings surrounding the 1983 action filed in the United District Court for the Eastern District of Pennsylvania, *Keahey v. Bethel Township, et al*, 11-cv~7210 (hereinafter "the federal action") and the

---

3. At the arbitration, Mr. Keahey withdrew Count III — wrongful use of judicial proceedings. "For purposes of the arbitration — plaintiff withdraws Count III of his complaint. (January 14, 2014, report and award of arbitrators).

issuance of the affidavit described above. The December 13, 2013 memorandum opinion of the honorable Ronald L. Buckwalter in the federal action aptly describes the course of events that lead to Mr. Keahey's federal court action and the role of the affidavit at issue. (December 13, 2012, memorandum opinion of U.S.D.C.J Buckwalter attached as Exhibit B to defendant's May 6, 2014, memorandum of law in opposition to plaintiffs motion for summary judgment).[4]

On the evening of November 25, 2009, the Bethel Police responded to a call from Wendy Keahey, concerning a domestic dispute at the Keahey residence, 1584 Conchester Road, Bethel Township, Delaware County, Pennsylvania. (December 13, 2012, memorandum opinion of U.S.D.C.J Buckwalter, p. 1, attached as Exhibit B to defendant's May 6, 2014, memorandum of law in opposition to plaintiff's motion for summary judgment). [Bethel] Officers James Register and Brian Buck responded to the call. *Id.* The officers arrived in separate cars, and they observed that there were two vehicles parked outside the residence, a Ford F150 truck and 1987 Mustang. *Id.* at 2. Officer Buck described the couple as being "verbally combative upon [their] arrival." *Id.* According to Officer Register, Wendy Keahey was "heated" and "agitated" upon the officers arrival, the couple was arguing, and Wendy Keahey was "adamant" that she wanted her husband out of the house. *Id.* The officers then separated the couple to question them separately. Ms. Keahey informed Officer Buck that the mortgage to the property was in her name and the F150 truck and 1987 Mustang were titled solely in her name. *Id.* When asked by Officer Buck if she had somewhere else

---

4. Internal citations omitted.

she could go, Wendy Keahey replied that she did not. *Id.* Officer Register asked George Keahey if he had somewhere else he could go, and Mr. Keahey stated he had a friend's house to which he could go and voluntarily agreed to do so. *Id.* Wendy Keahey refused to let her husband take the F150 truck and suggested that he contact Irene Reardon, a woman Mr. Keahey was allegedly seeing, and ask her for a ride. *Id.*

Mr. Keahey describes a different scene. (December 13, 2012, memorandum opinion of U.S.D.C.J Buckwalter, p. 2, attached as Exhibit B to defendant's May 6, 2014, memorandum of law in opposition to plaintiffs motion for summary judgment). He states that his wife was "very inebriated" and "really looped" when the officers arrived. *Id.* He also states that, while his wife was angry that he would not give her the keys to the Ford F150 as a result of her intoxication, he would not classify the situation as an "argument." *Id.* He also claims that he had been home from work for only ten minutes and was just sitting down to eat when the police arrived. *Id.* at 3. Mr. Keahey says that Officer Buck said to him, "One of you has to leave. You both can't stay in the house tonight." *Id.* He was also told that he would be unable to take the F150 truck or the Mustang to leave because they were his wife's vehicles. *Id.* Finally, Officer Register told Mr. Keahey that he was going to take him in his police car, and asked if Keahey wanted to get his coat. *Id.*

Mr. Keahey was eventually taken by Officer Register in his police car and dropped off at a nearby McDonald's restaurant. (December 13, 2012, memorandum opinion of U.S.D.C.J Buckwalter, p. 3, attached as Exhibit B to defendant's May 6, 2014, memorandum of law in opposition to plaintiffs motion for summary judgment).

At the time, Keahey states that he felt he was under arrest "in a legal sense," and felt this way because he was going to get in the front seat of the car but was told he need to sit in the back seat. *Id.* Mr. Keahey was picked up and given a ride by Ms. Reardon to another friend's house where he spent the night. *Id.*

Mr. Keahey returned to the property the next morning. (December 13, 2012, memorandum opinion of U.S.D.CJ Buckwalter, p. 3, attached as Exhibit B to defendant's May 6, 2014, memorandum of law in opposition to plaintiffs motion for summary judgment). When his wife discovered he had returned, she "started screaming" and Mr. Keahey took the Ford F150 truck and left. *Id.* Mrs. Keahey then informed [Bethel] Officer Bradshaw and Detective Mervine of the previous night's events, told them that her husband did not have her permission to use the truck, and that she did not want to file charges against her husband. *Id.* at 4. Mr. Keahey spoke with Detective Mervine advising that he did not have to return the truck and was not planning on doing so. *Id.* Later that day, a "stop and hold" order was placed on the truck. *Id.* The "stop and hold" order was removed the following day after Officer Bradshaw consulted with the Delaware County District Attorney's Office. *Id.*

On January 23, 2010, upon discovering the truck parked outside the home of Irene Reardon, Ms. Keahey took the truck and parked it at a new location. (December 13, 2012, memorandum opinion of U.S.D.C.J Buckwalter, p. 4, attached as Exhibit B to defendant's May 6, 2014, memorandum of law in opposition to plaintiffs motion for summary judgment). Upon discovering that the vehicle was missing, Mr. Keahey called the Bethel Police and demanded that the truck be returned to him as he had

personal belongings and items needed for his law practice. *Id.* at 5. He also advised the Bethel police that he had a court order allowing him to use the truck. *Id.* On the same day, Mrs. Keahey contacted the Bethel police and informed them that Irene Reardon had called and threatened her. *Id.* She advised that she would return her husband's personal belongings and items needed for his law practice, but she would not return the truck. *Id.* Upon being informed that his belongings would be returned by his wife, Mr. Keahey advised that he wanted his wife charged with theft. *Id.* Mr. Keahey was advised that if he wanted charges filed, he needed to contact the police where the alleged theft took place, Aldan Borough [Delaware County, Pennsylvania]. *Id.* On February 17, 2010, the Delaware County Court of Common Pleas entered an order permitting Mr. Keahey to use what was identified as Wendy Keahey's 1987 Mustang" for a period of thirty days, "at which time he shall return the vehicle to Wendy Keahey without further proceeding." *Id.* at 6.

Following the above-described course of events, Mr. Keahey filed an action in the United States District Court for the Eastern District of Pennsylvania bringing six counts: (1) seizure and detention without probable cause in violation of 42 U.S.C. § 1983; (2) seizure and deprivation of property in violation of 42 U.S.C. § 1983; (3) conspiracy to deprive plaintiff of his rights under § 1983; (4) false imprisonment; (5) harassment; and (6) malicious abuse of process. (December 13, 2012, memorandum opinion of U.S.D.CJ Buckwalter, p. 7, attached as Exhibit B to defendant's May 6, 2014, memorandum of law in opposition to plaintiffs motion for summary judgment). Counts (5) harassment and (6) malicious abuse of process claims were dismissed and Mr. Keahey later agreed to

drop count (3) the conspiracy claim. The remaining claims were ultimately dismissed following Judge Buckwalter's consideration of the Bethel defendants' motion for summary judgment.[5]

Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter Summary Judgment. *Hovis v. Sunoco, Inc.*, 64 A.3d 1078, 1081 (Pa. Super. 2013) (quoting *Cassel-Hess v. Hoffer*, 44 A.3d 80, 84-85 (Pa. Super. 2012)). In the instant matter, the trial court ranted Mrs. Keahey's motion for summary judgment finding that Mrs. Keahey was not a named party in the federal court action. The affidavit dated October 18, 2012 was attached to a legal pleading filed on behalf of Bethel Township in that matter.

As part of his Rule 26 Disclosure in the federal action, Mr. Keahey listed Wendy Keahey, as a witness. (Exhibit A to defendant's May 6, 2014, memorandum of law in opposition to plaintiffs motion for summary judgment). Mrs. Keahey signed an affidavit at the behest of the Bethel Township defendants. This affidavit was affixed to Bethel Township Police defendant's motion for leave to file affidavit of Wendy Keahey. Wendy Keahey's role in

---

5. Mr. Keahey appealed the dismissal of the federal action to the third circuit court of appeals but that appeal was also dismissed. (Exhibit D to defendant's May 6, 2014, memorandum of law in opposition to plaintiffs motion for summary judgment)

the federal action was that of a witness. As a result of the Bethel Township Police defendants utilizing Mrs. Keahey's affidavit, Mr. Keahey sued his wife for defamation and wrongful use of civil proceedings. Even in the light most favorable to the nonmoving party, Mrs. Keahey is entitled to judgment as a matter of law.

To the extent that Mr. Keahey was prosecuting his wrongful use of civil proceedings theory,[6] said claim must fail. 42 Pa.C.S.A. § 8351, wrongful use of civil proceedings, provides in relevant part:

a) Elements of action. — A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:

(1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and

(2) The proceedings have terminated in favor of the person against whom they are brought.

As Mrs. Keahey was not a party to the federal action, any claims under Count III — wrongful use of judicial proceedings pursuant to 42. Pa.C.S. § 8351, were properly dismissed.

Summary judgment was also appropriately granted on the defamation counts. Pursuant to the judicial privilege,

---

6. At the arbitration, Mr. Keahey withdrew Count III — wrongful use of judicial proceedings. "For purposes of the arbitration — plaintiff withdraws Count III of his complaint. (January 14, 2014, report and award of arbitrators).

a person is entitled to immunity for communications that are issued in the regular course of judicial proceedings. Statements made during judicial proceedings by a party, witness, counsel or judge, whether occurring in open court or in the pleadings, are absolutely privileged and thus cannot give rise to a defamation action. *Bochetto v. Gibson*, 580 Pa. 245, 860 A.2d 67 (2004). The judicial privilege is based on the "public policy which permits all suiters, however bold and wicked, however virtuous and timid, to secure access to the courts of justice to present whatever claims, true or false, real or fictitious, they seek to adjudicate." *Id.* The judicial privilege is extended not only to parties so that they are not deterred from using the courts, but also to judges so that they may "administer the law without fear of consequences," "*to witnesses to encourage their complete and unintimidated testimony in court, and to counsel to enable him to best represent his client's interests.*" *Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53, 56 (1971)(emphasis added); *Bochetto v. Gibson*, 580 Pa. 245, 251, 860 A.2d 67, 71 (2004).

There is no civil liability for publishing an alleged defamatory statement in a judicial proceeding or as part of a judicial proceeding if it has some relation to the proceeding. Statements by a party, a witness, counsel, or a judge cannot be the basis of a defamation action whether they occur in the pleadings or in open court. *Mosley v. Observer Publishing Company*, 619 A.2d 343, 345 (Pa. Super. 1993); *Morley v. Gory*, 814 A.2d 762, 765 (Pa. Super. 2002). Wendy Keahey's role in the federal action was that of a witness. As a result of the Bethel Township Police Defendants utilizing Mrs. Keahey's affidavit, Mr. Keahey seeks damages in this civil suit. However, as

statements by a witnesses in a judicial proceeding cannot be the basis of a defamation action, summary judgment was appropriately entered in favor of Mrs. Keahey and against Mr. Keahey.

For the aforementioned reasons, the trial court respectfully requests that its decision be affirmed.