J-A09024-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| GEORGE B. KEAHEY, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| WENDY KEAHEY, | : | |
| | : | |
| Appellee | : | No. 2169 EDA 2014 |

Appeal from the Order entered June 18, 2014,
Court of Common Pleas, Delaware County,
Civil Division at No. 2013-003741

BEFORE:  BOWES, DONOHUE and STABILE, JJ.

MEMORANDUM BY DONOHUE, J.:                    **FILED APRIL 21, 2015**

Appellant, George B. Keahey ("GK"), appeals from the order entered June 18, 2014 granting summary judgment in favor of Appellee, Wendy Keahey ("WK").  GK contends that the trial court erred in dismissing his claims for defamation and libel based upon its conclusion that WK's statements were protected by the judicial privilege.  For the reasons that follow, we affirm the trial court's order.

GK and WK are divorcing spouses.  GK initiated this action on or about April 18, 2013, alleging in a civil complaint that he had suffered damages as a result of an affidavit (hereinafter, WK's Affidavit") provided by WK in a federal civil rights lawsuit brought by GK against Bethel Township and certain of its police officers (hereinafter, the "Federal Suit").  In the present case, GK's complaint against WK asserted three caused of action against

WK: (1) statutory defamation (42 Pa. C.S.A. § §8343); (2) common law libel/defamation; and (3) wrongful use of judicial proceedings (42 Pa. C.S.A. § 8351).

By way of background, we begin with the Federal Suit. In its written opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the trial court aptly summarized the factual and procedural background of the Federal Suit as follows:

> On the evening of November 25, 2009, the Bethel Police responded to a call from [WK], concerning a domestic dispute at the Keahey residence, 1584 Conchester Road, Bethel Township, Delaware County, Pennsylvania. [Bethel] Officers James Register and Brian Buck responded to the call. The officers arrived in separate cars, and they observed that there were two vehicles parked outside the residence, a Ford F150 truck and 1987 Mustang. Officer Buck described the couple as being "verbally combative upon [their] arrival." According to Officer Register, [WK] was "heated and agitated" upon the officers arrival, the couple was arguing, and [WK] was "adamant" that she wanted her husband out of the house. The officers then separated the couple to question them separately. [WK] informed Officer Buck that the mortgage to the property was in her name and the F150 truck and 1987 Mustang were titled solely in her name. When asked by Officer Buck if she had somewhere else she could go, [WK] replied that she did not. Officer Register asked [GK] if he had somewhere else he could go, and [GK] stated he had a friend's house to which he could go and voluntarily agreed to do so. [WK] refused to let her husband take the F150 truck and suggested that he contact Irene Reardon, a woman [GK] was allegedly seeing, and ask her for a ride.

[GK] describes a different scene. He states that his wife was "very inebriated" and "really looped" when the officers arrived. He also states that, while his wife was angry that he would not give her the keys to the Ford F150 as a result of her intoxication, he would not classify the situation as an "argument." He also claims that he had been home from work for only ten minutes and was just sitting down to eat when the police arrived. [GK] says that Officer Buck said to him, "One of you has to leave. You both can't stay in the house tonight." He was also told that he would be unable to take the F150 truck or the Mustang to leave because they were his wife's vehicles. Finally, Officer Register told [GK] that he was going to take him in his police car, and asked if [GK] wanted to get his coat.

[GK] was eventually taken by Officer Register in his police car and dropped off at a nearby McDonald's restaurant. At the time, [GK] states that he felt he was under arrest "in a legal sense," and felt this way because he was going to get in the front seat of the car but was told he need to sit in the back seat. [GK] was picked up and given a ride by Ms. Reardon to another friend's house where he spent the night. [GK] returned to the property the next morning. When his wife discovered he had returned, she "started screaming" and [GK] took the Ford F150 truck and left. [WK] then informed [Bethel] Officer Bradshaw and Detective Mervine of the previous night's events, told them that her husband did not have her permission to use the truck, and that she did not want to file charges against her husband. [GK] spoke with Detective Mervine advising that he did not have to return the truck and was not planning on doing so. Later that day, a "stop and hold" order was placed on the truck. The "stop and hold" order was removed the following day after Officer Bradshaw consulted with the Delaware County District Attorney's Office.

On January 23, 2010, upon discovering the truck parked outside the home of Irene Reardon, [WK]

took the truck and parked it at a new location. Upon discovering that the vehicle was missing, [GK] called the Bethel Police and demanded that the truck be returned to him as he had personal belongings and items needed for his law practice. He also advised the Bethel police that he had a court order allowing him to use the truck. On the same day, [WK] contacted the Bethel police and informed them that Irene Reardon had called and threatened her. She advised that she would return her husband's personal belongings and items needed for his law practice, but she would not return the truck. Upon being informed that his belongings would be returned by his wife, [GK] advised that he wanted his wife charged with theft. [GK] was advised that if he wanted charges filed, he needed to contact the police where the alleged theft took place, Aldan Borough [Delaware County, Pennsylvania]. On February 17, 2010, the Delaware County Court of Common Pleas entered an order permitting [GK] to use what was identified as [WK's] 1987 Mustang for a period of thirty days, "at which time he shall return the vehicle to [WK] without further proceeding."

Following the above-described course of events, [GK] filed an action in the United States District Court for the Eastern District of Pennsylvania bringing six counts: (1) seizure and detention without probable cause in violation of 42 U.S.C. § 1983; (2) seizure and deprivation of property in violation of 42 U.S.C. § 1983; (3) conspiracy to deprive [GK] of his rights under § 1983; (4) false imprisonment; (5) harassment; and (6) malicious abuse of process. Counts (5) harassment and (6) malicious abuse of process claims were dismissed and [GK] later agreed to drop count (3) the conspiracy claim. The remaining claims were ultimately dismissed following [the Honorable United States District Court] Judge Buckwalter's consideration of the Bethel Defendants Motion for Summary Judgment.

Trial Court Opinion, 11/10/2014, at 8-12 (citations and footnotes omitted).

WK signed her Affidavit on or about October 18, 2012, and on October 23, 2012, the defendants in the Federal Suit attached it to a motion for leave to amend their motion for summary judgement. WK's Affidavit stated in full as follows:

The undersigned, Wendy Keahey, hereby deposes and says as follows:

1. I married George Keahey on September 6, 2002.

2. Because of George's credit background, the mortgage on 1584 Conchester Road was in my name only.

3. At the time of the marriage I owned a 1987 Mustang my father bought in 1988 and gave to me when I was in college.

4. I also owned a Subaru which I traded in for a Ford F-150 truck, through a discount I had as an employee of a Ford dealership. The truck and loan were in my name only.

5. Several weeks before the incident on November 25, 2009, I called police after George threw me across the kitchen when I was trying to leave to go to a friend's home.

6. George was yelling, "Go ahead, run me over!" and other things as he stood in the back of the truck preventing me from leaving. I locked myself in the truck and called police.

7. When officers arrived, one officer took George to one side of the driveway and another officer got me and my dog out of the truck.

8. In a threatening tone, George said I better get a good attorney.

9. The officer warned George that he should be careful because I wasn't pressing charges and allowed me to leave in the truck since it was in my name.

10. On the night before Thanksgiving, 2009, we had another argument. I was not drunk or under the influence of drugs.

11. George was secretly taking boxes from the home and placing them in the back of the truck which was locked and he had the

only key. He refused to give me the key so I could see what he was trying to take out of the house.

12. We were also arguing because I believed George was seeing another woman, Irene Reardon, and I confronted him about this.

13. After calling the police, I waited outside on the walkway for police to arrive and I believe George was in the sunroom.

14. When officers arrived, one asked me where George was and I believe I walked him to the sunroom and opened the door.

15. George immediately started giving the officer a hard time and was argumentative and uncooperative.

16. An officer asked me if I had somewhere I could go and I said I did not and I really didn't see why I had to leave.

17. I told the officer the mortgage was in my name alone, but the deed was in both of our names.

18. The officer with George then asked me to come inside.

19. He told me that George was willing to leave and wanted to know if George would take the truck.

20. I told the officer no, George would not take the truck and that it is in my name alone and suggested George call his girlfriend, Irene, for a ride.

21. By this point, George was no longer argumentative.

22. I went back outside and heard one of the officers offer to give George a ride and George walked away with them.

23. I did not see any of the officers forcibly remove George from the home.

24. During this time, George was wearing the same clothes he was wearing when he left for work in the morning.

25. Early the next morning, I heard the truck being started and I saw it being driven off.

26. After seeing the truck being driven off I called police.

27.    Two officers arrived and I told them what had happened the night before and that George was told he wasn't to take the truck.

28.    The next thing I heard about the truck was from Officer Bradshaw who advised me that the D.A. had told them they couldn't charge George with unauthorized use and there was nothing more they could do.

29.    On January 23, 2010, after George refused to return my truck, I took my truck from where it was parked on the street in front of the home of Irene Reardon.

30.    When I got home, I had a message I felt was threatening from Irene Reardon (telling me I was "done")

31.    I was afraid of what they might do and called police.

32.    An officer came to the house and listened to the message and said he could see how the message could be seen as threatening.

33.    An Order was issued in the divorce case that allowed George to use the Mustang for 30 days only. When the 30 days were up and George refused to return the Mustang, I contacted the police.

34.    I did not know any of the officers at the Bethel Police.

       FURTHER AFFIANT SAYETH NOT.

*Id.* at 4-6.  The federal district court granted the motion for leave to amend and subsequently granted the motion for summary judgment.[1]

In the present lawsuit, GK alleges that WK's Affidavit was defamatory because it "falsely accused him of criminal assault," GK's Brief at 3, and because in filing it WK "vindictively conspired with Bethel Defendants to

---

[1]   The United States Court of Appeals for the Third Circuit affirmed the district court's grant of summary judgment.  Trial Court Opinion, 11/10/2014, at 12 n.5.

thwart [GK's] success in the [Federal Suit]." Complaint, ¶ 21. On April 28, 2014, GK filed a motion for partial summary judgment, and on May 6, 2014, WK filed a motion for summary judgment. By order dated June 18, 2014, the trial court granted WK's motion for summary judgment. On appeal, GK contends that the trial court erred as a matter of law in issuing its June 18, 2014 order.

Our standard of review with respect to a trial court's decision to grant or deny a motion for summary judgment is as follows:

> A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.
>
> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non[-]moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

***Thompson v. Ginkel***, 95 A.3d 900, 904 (Pa. Super. 2014) (quoting ***JP Morgan Chase Bank, N.A. v. Murray***, 63 A.3d 1258, 1261–62 (Pa. Super. 2013)), *appeal denied*, 108 A.3d 36 (Pa. 2015).

The trial court determined that WK's Affidavit could not form the basis for a defamation action because it is protected by the judicial privilege. We agree. In discussing the judicial privilege, our Supreme Court has instructed:

> Pursuant to the judicial privilege, a person is entitled to absolute immunity for "communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought." ***Post v. Mendel***, 510 Pa. 213, 507 A.2d 351, 355 (1986) (emphasis in original). This privilege is based on the "public policy which permits all suiters, however bold and wicked, however virtuous and timid, to secure access to the courts of justice to present whatever claims, true or false, real or fictitious, they seek to adjudicate." ***Id.*** As we explained in ***Post***, "[t]o assure that such claims are justly resolved, it is essential that pertinent issues be aired in a manner that is unfettered by the threat of libel or slander suits being filed." ***Id.*** Notably, this privilege is extended not only to parties so that they are not deterred from using the courts, but also to judges so that they may "administer the law without fear of consequences," "to witnesses to encourage their complete and unintimidated testimony in court, and to counsel to enable him to best represent his client's interests." ***Binder v. Triangle Publications, Inc.***, 442 Pa. 319, 275 A.2d 53, 56 (1971).

***Bochetto v. Gibson***, 860 A.2d 67, 71 (Pa. 2004).

Pennsylvania has adopted section 587 of the Restatement (Second) of Torts, which provides an absolute privilege to parties to private litigation "to

publish defamatory matter concerning another … if the matter has some relation to the proceeding." Restatement (Second) of Torts § 587 (2012); *see, e.g.*, **Pawlowski v. Smorto**, 588 A.2d 36, 42 (Pa. Super. 1991). Section 588 offers a parallel rule for witnesses, providing that "a witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he [or she] is testifying, if it has some relation to the proceeding." Restatement (Second) Torts § 588 (2012). Since final judgments in cases are based on witness testimony, "it is necessary [ ] that a full disclosure not be hampered by fear of private suits for defamation." Restatement (Second) Torts § 588 cmt. (b) (2012).

The statements in WK's Affidavit, even if defamatory, may not form the basis for civil liability in Pennsylvania. In accordance with sections 587 and 588, WK's statements were provided in the regular course of judicial proceedings (at the summary judgment stage of the Federal Suit) and were pertinent and material to the subject matter of the Federal Suit. As a result, the trial court did not err in granting WK's motion for summary judgment dismissing all of GK's claims against her.[2]

---

[2] On appeal, GK has not challenged the trial court's dismissal of his claim for wrongful use of judicial proceedings pursuant to 42 Pa. C.S.A. § 8351 (Count III). The trial court noted that GK had not stated a cause of action because WK was not a party to the Federal Suit. Trial Court Opinion, 11/10/2014, at 14.

In his appellate brief, GK contends that the trial court's ruling applying the absolute judicial privilege was error because WK was not a client of the law firm representing the defendants in the Federal Suit, or a party, attorney, or judge in the Federal Suit. GK's Brief at 17. GK cites to no authority in support of such limitations on application of the judicial privilege, however, and this Court is not aware that any such limitations exist.

GK further argues that WK was not a "witness" because she did not testify in court or by deposition. *Id.* at 18. GK notes that WK stated that she submitted an affidavit so that she could avoid having to appear for a deposition. *Id.* Again, however, no such limitations on the application of the judicial privilege exist. Our Pennsylvania Supreme Court has ruled that "[a]ll communications pertinent to any stage of a judicial proceeding are accorded an absolute privilege which cannot be destroyed by abuse," and that "statements by a party, a witness, counsel, or a judge cannot be the basis of a defamation action **whether they occur in the pleadings or in open court**." *Binder v. Triangle Publ'ns, Inc.*, 275 A.2d 53, 56 (Pa. 1971) (emphasis added).

As the trial court correctly emphasized, GK himself identified WK in his Disclosure Statement pursuant to Rule 26 of the Federal Rules of Civil Procedure in the Federal Suit as a an individual "reasonably likely to have information concerning the subjects" at issue in that case. Trial Court

Opinion, 11/10/2014, at 13. We find unconvincing GK's argument that this point is irrelevant because neither party subsequently listed WK as a witness in their pretrial statements in the Federal Suit. Even if, as GK contends, the omission from the pretrial statements precludes WK from being a "witness in the litigation as a matter of Federal Law," GK's Brief at 23, it is irrelevant for present purposes. A person's status as a witness for purposes of application of the judicial privilege under Restatement section 588 does not depend upon their identification as a witness by a party to the litigation, as our Supreme Court has held that even those who volunteer as witnesses are protected under section 588. **Ginsburg v. Halpern**, 118 A.2d 201, 202 (Pa. 1955) ("Even if defendants had been shown to have volunteered to be witnesses and then [gave] false testimony against plaintiff [it] would not constitute a valid cause of action. In support of this we refer to the Restatement of Torts of the American Law Institute, Section 588.").

In WK's Affidavit, she testified under oath to what she observed and heard regarding the events at issue in the Federal Suit. Pursuant to sections 587 and 588 of the Restatement (Second) of Torts, she is protected by an absolute judicial privilege, even if her statements could be construed as libelous or defamatory. For this reason, the trial court's order granting WK's motion for summary judgment was not error, and GK is not entitled to any relief on appeal.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/21/2015</u>